NOT DESIGNATED FOR PUBLICATION

No. 120,049

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of K.L.,
A Minor Child.


MEMORANDUM OPINION

Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed March 8, 2019. Affirmed.

*Brian L. Williams*, of Williams Law Office, LLC, of Emporia, for appellant natural mother.

*Meghan K. Morgan*, assistant county attorney, and *Marc Goodman*, county attorney, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and HILL, JJ.


PER CURIAM: B.L., mother of K.L., appeals the termination of her parental rights to her daughter. She claims there is insufficient evidence that she is unfit and that condition is unlikely to change in the foreseeable future. She further claims the district court abused its discretion in determining that termination was in the best interests of K.L. Finding no error, we affirm.

The Kansas Department for Children and Families was granted protective custody of four-year-old K.L. in September 2016, based on the State's allegations that the Department had received numerous reports that K.L.'s mother had drug abuse problems and was unable to provide stable housing or care for her children. The State alleged that Mother had evaded DCF for years. The State further alleged that on September 10, 2016, DCF received a report that K.L.'s sister had died. On September 20, 2016, a police officer

1

stopped Mother for a traffic infraction. The officer notified DCF. A DCF officer told Mother that an officer needed to see K.L. to make sure she was safe. Mother did not bring K.L. to see the DCF officer as instructed. A few days later, Mother was stopped by the police again. This time, K.L. was with Mother. The police took K.L. into custody.

On September 23, 2016, Mother tested positive for methamphetamine and THC. On October 4, 2016, K.L. was adjudicated a child in need of care and ordered to remain in DCF custody. Mother's case plan goals were to:

- maintain appropriate housing;
- maintain appropriate income;
- complete a budget;
- submit to random UAs;
- complete a drug and alcohol evaluation and follow all recommendations;
- complete a mental health evaluation and follow all recommendations;
- complete a parenting class; and,
- once deemed appropriate, participate in family therapy with K.L.

In November 2017, the State filed a motion for termination of parental rights. The court terminated the father's parental rights prior to trial.

At trial, the State presented evidence of Mother's failures. Mother twice started but failed to complete mental health services. In November 2016, Mother saw Angie Indra, a psychologist at Crosswinds Counseling Center, for an intake meeting for trauma following the death of her infant daughter. Mother was "[v]ery distraught." While staying with her grandmother, the infant died of positional asphyxia—she suffocated in her sleep. Indra's recommendation was for ongoing therapy, medication clinic, and potentially ART. The goals of the therapy were for Mother to learn to process her grief, learn coping

2

skills, and reunite K.L. with her. Mother attended only two sessions; she had "no follow through."

Mother also saw Shane Mullen, a clinical psychotherapist, for an intake meeting in May 2017. Mother referred herself for anxiety, depression, and for losing her five-month-old child. Mullen diagnosed her with major depression disorder, generalized anxiety disorder, and marijuana use. Mullen testified it was difficult for Mother to take accountability for K.L. being removed from her home. Mullen recommended individual counseling to improve her coping skills and to reintegrate K.L. with her. Mother attended only two sessions.

K.L. attended therapy sessions with Jennifer Williams at Crosswinds Counseling and Wellness from October 2016 to January 2018. When K.L. started therapy, she had "extremely high anxiety" and posttraumatic stress symptoms including nightmares, difficulty sleeping, and flashbacks. K.L. had been in bed with her infant sister when her sister died during the night. Williams testified that K.L. and Mother had a noticeable bond. But K.L.'s visits with Mother were "anxiety provoking for her. She enjoys those visits. She loves her mom and wants to see her, but those visits were very high stress. I think sister's death was brought up often." Williams testified that Mother would make comments to K.L. that were not age-appropriate. Once Mother told K.L. that a family member was going to come get her from her bedroom window and "to be ready." Williams testified that K.L. was "extremely insightful for her age" and she knew that was wrong of her Mother. During visits, K.L.'s and Mother's roles were reversed. K.L. would have to comfort her Mother. Williams testified she believed Mother's refusal to get her own mental health treatment held K.L. back in her own therapy.

Mother had weekly visits with K.L. supervised by St. Francis Community Services. Mother did not have any unsupervised visits. The supervisors testified that Mother was consistent with her visits most of the time. Mother would bring snacks, toys,

3

and gifts. Mother and K.L. had a noticeable bond, love, and were excited to see each other. Mother was "very hands-on" and attentive. She would engage K.L. in activities such as arts and craft projects. But visits were "a little chaotic," "overly emotional," and "always a little high stress." Mother would break down emotionally, hyperventilate, and sob. K.L. was "very worried" about Mother and would try to comfort her while she cried. But visits improved and became less emotional over time.

The supervisors were also concerned because Mother would bring up age-inappropriate topics like her father's incarceration. Mother once told K.L. that St. Francis was keeping her and K.L. apart. Mother also brought up the anniversary of the death of K.L.'s younger sister, and K.L. got upset. During another visit, Mother gave K.L. a locket necklace containing her sister's ashes. Mother also told K.L. that she did not want to work on her case plan tasks, or that it was hard for her to work on them, and she did not understand why the court would not give her more time.

Mother missed visitations the month before trial because of a lack of transportation. K.L. got upset when her Mother did not show up for visitations; she had outbursts and crying fits, which were unusual for her.

Mother appeared to be under the influence of some substance several times at the St. Francis office. At one visitation, Mother appeared very erratic and under the influence. The St. Francis office called the police so Mother would not drive home. Mother was arrested on an outstanding warrant for an unpaid fine.

St. Francis regularly requested that Mother submit to drug testing. But Mother refused to submit to drug testing most of the time, saying things like, "'I will next week. I probably should be good by then.'" She acknowledged that she would test positive for marijuana. She also did not want to "'conform'" by submitting to a test. She took drug tests only "a very small amount" of the time. Mother was informed that if she could

4

provide clean UAs, she could have unsupervised visits with her daughter. But until that time, there were safety concerns. She tested positive for THC twice and positive for methamphetamine in April 2017.

In November 2017, Mother did enter drug and alcohol treatment at Mirror Inc. But she left "fairly early" in the treatment without completing it. Mother said she "did not need a piece of paper to tell her that she was clean and sober." When she entered treatment, she tested positive for several illegal drugs.

Mother did not complete most of her case plan tasks. Mother did complete a parenting class in March 2018. St. Francis completed a walk-through of her current residence and approved it. But Mother did not give St. Francis the information to complete background checks on her roommates until the day before trial. At various times, Mother said she worked at Subway, McDonalds, was a nanny, and was providing in-home healthcare. But she never provided proof of employment or completed a budget. She completed a mental health evaluation but did not follow the recommendations.

Mother testified that K.L. was removed from her custody only a few days after her infant daughter died. She testified that she teaches a yoga class once a month and does art as "coping outlets." She was also trying out for a roller derby team as "an outlet." She testified she attends a grief group once a month. She has a grief blog and is a member of other online support groups. She testified that she is employed as a nanny and sells art on Etsy. She also does home health for a man on the weekend. She recently obtained a valid driver's license. She admitted she was arrested four months ago on a warrant for an old misdemeanor theft case. She admitted that she used marijuana and methamphetamine even before the death of her infant child. She admitted she still uses marijuana "regularly," but denied using methamphetamine in the past six months. She refused to take prescription medication for her mental health, but she would use "mind-altering substances to cope." She admitted she was not currently seeing a therapist and was not in

drug and alcohol treatment. She was asked to submit to a UA the day before trial and she refused.

The court ordered Mother to have an immediate UA in the basement of the courthouse. A half hour later, the court was informed that Mother had not shown up to take the UA, and the court proceeded with closing arguments. The guardian ad litem recommended termination of parental rights stating that Mother had not put any effort into getting her child back and her continued drug use posed a safety concern. Mother did eventually show up for the UA and tested positive for marijuana and methamphetamine.

On August 2, 2018, the district court found that Mother:
- had obtained appropriate housing and completed a parenting class;
- had ongoing drug use and refused treatment;
- did not follow through with her mental health treatment;
- tested positive for both marijuana and methamphetamine on the day of trial;
- had not made progress in almost two years (with the exception of the parenting class);
- was incapable of acting as a parent to K.L.;
- was unable to change in the foreseeable future because she had been given the opportunity for treatment for her drug use and mental health, but she had not engaged those services to an extent to be successful; and
- did not make any progress on her drug use in the last two years—she used drugs just before trial.

The court found that it was in K.L.'s best interests to terminate Mother's parental rights. "Two years in custody is way too long. . . . [B]y refusing mental health treatment and

then walking away from drug and alcohol treatment, there's nothing else the Court can do."

Mother appeals, contending that (1) there was not sufficient evidence to find by clear and convincing evidence that she was unfit and that condition was unlikely to change in the foreseeable future; and (2) the district court abused its discretion in determining that termination was in the best interests of K.L.

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the custody, care, and control of the child, the parent is entitled to due process of law. *In re Adoption of A.A.T.*, 287 Kan. 590, 600-01, 196 P.3d 1180 (2008).

The Revised Kansas Code for Care of Children provides that the court may terminate parental rights when a child has been adjudicated a child in need of care. K.S.A. 2017 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in making a determination of unfitness. K.S.A. 2017 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2017 Supp. 38-2269(c). Any one of the factors in K.S.A. 2017 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2017 Supp. 38-2269(f).

> "When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated. [Citation omitted.]" *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

Mother specifically challenges the district court's finding that her unfitness was unlikely to change in the foreseeable future. Mother contends that the loss of her infant daughter was difficult to overcome, but that she has made positive changes such as obtaining her driving license, obtaining employment, attending grief groups in person and online, teaching yoga, doing art as therapy, completing a parenting class, obtaining housing, and having good visits with K.L.

The "foreseeable future" should be judged from the child's perspective, rather than the parent's, because time perception of a child differs from that of an adult. *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). As the court stated in *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008):

> "A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time."

At trial, Mother showed no willingness to stop using illegal drugs, get drug treatment, or to attend individual therapy and take medication as prescribed. She tested positive for both methamphetamine and marijuana the day of trial. K.L. has been out of her home since September 22, 2016. There is no telling when Mother will be clean and sober to even have unsupervised visits with K.L., let alone regain custody. Moreover, despite the various places of employment Mother has claimed to work, she has never submitted proof of employment or completed a budget to show that she could take care of her daughter. While she completed a parenting class, obtained housing, and was having

8

less emotional visits with K.L., these changes took almost two years—a long time for a young child—and there are still major obstacles to reintegration. A rational fact-finder could have found it highly probable that Mother was unfit and that condition was unlikely to change in the foreseeable future because of her failure to engage in drug treatment and mental health services.

After the court has determined a parent is unfit, termination is not mandatory. Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2017 Supp. 38-2269(g)(1). In making the best-interests determination

> "the court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

This court reviews the court's best-interests determination for abuse of discretion. An abuse of discretion

> "occurs when no reasonable person would agree with the district court or the district court premises its decision on a factual or legal error. In determining whether the district court has made a factual error, we review any additional factual findings made in the best-interests determination to see that substantial evidence supports them." *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014).

9

Mother contends that the district court abused its discretion in determining that termination of her parental rights was in K.L.'s best interests. She contends she and K.L. have a strong bond, they laugh and play during visits, display affection, and console each other. She contends K.L. already lost her sister, and losing her mother is not in her best interests. She contends the district court did not give adequate weight to the evidence she presented that she had lost her infant child, but she was making progress.

Here, the district court reasoned that Mother had not made any progress on two major issues—drug treatment and mental health treatment—and that two years of K.L. being in DCF custody was too long. The court stated:

> "Two years in custody is way too long. I know that the mother loves her daughter and I know the daughter loves her mother, but nothing has changed since day one. Nothing. And at some point we have to move on. . . . if you don't make progress on the two issues that caused the child to go into custody in two years . . . by refusing mental health treatment and then walking away from drug and alcohol treatment, there's nothing else the Court can do."

Mother does not claim that the district court made a legal or factual error—rather, she asks us to reweigh the evidence, which this court does not do. A reasonable person could agree that termination of Mother's rights was in K.L.'s best interests. Despite their affection for each other, Mother showed no willingness to take the steps necessary to regain custody of K.L. Mother made only small steps in two years. Continuing Mother's rights would only further delay finding a permanent placement for K.L.

Affirmed.